RICHARD O. ZOBER, PROSECUTOR, v. BENJAMIN F. TURNER, DIRECTOR OF THE DEPARTMENT OF PUBLIC SAFETY, CITY OF PASSAIC, NEW JERSEY, RESPONDENT.

Argued January term, 1929—Decided February 4, 1929.

Before Justices MINTURN, BLACK and CAMPBELL.

For the prosecutor, *Filbert L. Rosenstein, Frederick S. Ranzenhofer* and *Ward & McGinnis.*

For the respondent, *Joseph J. Weinberger* and *Merritt Lane.*

PER CURIAM.

The writ of *certiorari* sued out in this case by Richard O. Zober, prosecutor, is designed to review the proceedings taken against him before Benjamin F. Turner, director of the department of public safety in the city of Passaic, which pro-

ceedings resulted in a judgment dismissing the prosecutor from his office as chief of police of said city.

The facts in the case substantially are that charges were preferred against the chief of police, Zober, on November 16th, 1927, upon which he was directed to appear for trial on November 29th, 1927, before Benjamin F. Turner, as director of the department of public safety of the said city of Passaic.

The complaint was quite extensive in character, but stated in effect five charges against the prosecutor, which were again subdivided into twenty-five charges. He was tried upon these charges, and as the result of testimony thereon adduced, further charges were preferred against him, directing him to appear before Commissioner Turner for trial thereon. The additional complaint was made up of four charges, subdivided into twenty-four charges.

The prosecutor at the outset of the trial challenged the right of the commissioner to try him, on the ground that the said Turner was so prejudiced against him that he could not give him a fair and impartial trial, which could constitute the only basis for his dismissal from the police department. The prosecutor offered to give testimony in substantiation of this challenge, but the offer was rejected, and the challenge overruled.

Depositions were taken under the writ, by the prosecutor, which tended to show the relationship existing between the commissioner and the prosecutor. Turner and Zober are both members of the police department, Turner having entered the service in 1900, and Zober having become a member twelve years thereafter. In due time he became chief of the department, during which period of time Turner held the rank of captain of the detective bureau of Passaic.

In April, 1924, after Zober had been captain of police for two years, the then chief resigned, and the commissioner, Mr. Preiskel, was called upon to fill the vacancy. Both Captain Turner and Captain Zober were rival candidates for the office, Zober becoming the chief of police.

A great deal of testimony has been taken under the rule and before the commissioner, showing that the relations which existed between these two men were anything but friendly,

Turner having repeatedly referred to the prosecutor in uncomplimentary terms, and on many occasions having refused to hold friendly intercourse with him, with mutual friends, at public dinners and elsewhere.

It may be conceded, therefore, as a result of this testimony, that the two men were not friendly, and it may be conceded that for reasons of his own, which he considered satisfactory, Turner refused to assume that general friendly intercourse which should have existed between two men performing a substantially similar public service. Both the letters and the orders of Turner, as well as his language when speaking of Zober, indicate that condition of mind.

Under these circumstances the prosecutor was tried before Turner, as director of the department of public safety, with the result that the prosecutor was dismissed from his office as chief of police by the respondent, Turner.

The prosecutor now insists that because the commissioner of public safety was biased and prejudiced, the prosecutor did not have a fair trial, and for that reason alone the dismissal should be set aside and the prosecutor reinstated as chief of police. He at the same time concedes that if Commissioner Turner could not try these charges leveled against the prosecutor, there would be no other tribunal to try them, and the discipline required of the police department of the city of Passaic under such circumstances would be without any means of vindication.

In the language of the respondent's brief, if the director of the department of public safety be disqualified from trying a case against "a chief of police whom the evidence demonstrates has been guilty of knowingly acting as a 'fence' for the disposal of automobiles stolen by a gang of automobile thieves, one of which stolen cars was sold by the chief to one of his subordinates in the police department," then the city and the department are without any recourse for the purpose of vindicating discipline in the police department.

This vindication of the action of the director of the department of public safety in dismissing the prosecutor from the police force, may be stated, in his own language, as follows:

"On or about the 29th day of January, 1926, a Cadillac car was stolen in Newark, New Jersey. This car is known as the Kaufman car. On or about March 27th, 1926, Chief Zober purchased that car for what he says was the sum of $1,600; and on or about May 12th, 1926, he sold that car to one John J. Labash for $2,000.

"On or about April 12th, 1926, a Buick car, a Master-Six, known as the Chambers car, was stolen in New York City, and on or about the 16th day of July, 1926, Chief Zober purchased that car for $1,000, as he says, and that car was in his possession, and taken out of his possession on the 25th day of October, 1927.

"On or about June 10th, 1926, a Buick car was stolen in Summit, New Jersey, known as the Rider car; and on or about June 23d, 1926, Chief Zober purchased that car for what he says was $1,100, and on or about the 28th day of June, 1926, he sold that car to one Matthias Winter, a patrolman in the police department for $1,200.

"On or about July 9th, 1926, a car which is known as the Perkins car was stolen in New York City, and on or about July 10th, 1926, that car was purchased by Chief Zober for what he says was $750, on or about the 14th day of October, 1926, that car was sold by the chief to one Carroll D. Hipp for $850.

"Each of these cars had either mutilated or changed motor serial numbers."

It might properly be contended, as it is argued in the brief by counsel, that the business of buying and selling cars, irrespective of the knowledge of the chief of police that they were stolen, was a practice incompatible with the duties of the prosecutor as chief of police; and to further demonstrate the culpability of the chief of police in the matter, it is also shown by the evidence that he obtained licenses for the cars in his own name, and in some instances without signing applications therefor, and in other instances signing applications without having sworn thereto, in violation of the provisions of the Motor Vehicle act; and it is insisted that in this practice, and for the purpose of carrying on this business, he deliberately perjured himself before the commissioner.

It is also insisted that he had in his possession automobiles with mutilated numbers, in violation of the provisions of the Motor Vehicle act, which act makes the mere possession of an automobile having numbers which indicate mutilation, without giving notice thereof to the department of motor vehicles, a criminal act, the statute in question being intended to impose the burden upon the possessor of the automobile of ascertaining the fact, at the time of the purchase, whether the numbers have been tampered with, with an intent to evade the provisions of the statute. *State* v. *Lee,* 100 *N. J. L.* 203.

The chief of police must be charged with a knowledge of the law regarding these practices. The explanation of the chief of police that he did not know the law, or that he thought the matter could be fixed up, is not enough to relieve him of official responsibility in such matters, particularly in view of his long experience in the police department, in which it must be assumed he had obtained a varied knowledge of such practices. Our reading of the testimony indicates that he was aware of the illegal practices which were thus carried on, and that fact alone would be enough to sustain the charge made against him in this respect; and it is no answer to the sufficiency of such charges to allege that the trial court, or the director in this instance, entertained prejudices against him, or to concede, as the prosecutor alleges in this instance, that upon the testimony no fair-minded man could have done otherwise than to dismiss him.

The prosecutor in this case entered one hundred fifty objections to the admission of testimony against him, and to the exclusion of testimony offered for him, and these rulings he makes a basis of his objection, because the testimony was overruled, or excluded, on the ground that such action by the director left him without any basis for an appeal; although the prosecutor in insisting upon this fact as indicative of the prejudice of the commissioner, specifies no legal ground upon which may be rested an objection to the procedure of action of the commissioner, except in the case of the witness Shadd, which we have examined and have not found to be material to the question propounded to the witness.

The theory upon which the prosecutor presents his case is that rulings of this nature are not appealable. With this manifestly we cannot agree, since this court, as the appellate tribunal under the circumstances, will examine the testimony and pass upon its admissibility and relevancy, and if the evidence did not support the charges would necessarily, under the cases heretofore decided by this court, reverse the conviction, if legal error of a material nature were committed. If it were conceded that the director, from the testimony in the case, was shown to be absolutely prejudiced and disqualified by reason of bias, as is contended by the prosecutor, it would not follow that the duty imposed upon him by law of trying the defendant upon the charges submitted could be evaded or avoided, for as was held by the learned chancellor in *In re Hague*, 6 *N. J. Adv. R.* 1770, "the interest which disqualifies a judge is a direct pecuniary one, or one which involves some individual right or prejudice in the subject-matters of the litigation." And further, "a prejudice growing out of business, political or social relations is not sufficient to disqualify a judge." 33 *C. J.* 1001. And "prejudice against the cause or defense of a party is not a disqualifying prejudice." And in the same case it was stated that "erroneous rulings against a litigant, even when numerous and continuous, form no ground for a charge of bias or prejudice, especially when they are subject to review; nor are a judge's expressions of opinion, uttered in what he conceives to be the discharge of a judicial duty, evidence of bias or prejudice."

The cases generally upon this subject are to the same effect, following the statement contained in 33 *C. J.* 998, that "while there are *dicta* to the effect that at common law a judge may be disqualified on the ground of his bias or prejudice, it is generally held, in the absence of statutory provisions, that bias or prejudice on the part of a judge, which is not based on interest, does not disqualify him."

The prosecutor in any event, both under the rules of the common law and under the rules and regulations of the police department, quoted in his brief, is entitled to a fair and impartial hearing; and whether he has had such a fair and impartial hearing, upon the entire evidence, after a review

by the commissioner, may be dealt with by this court as the reviewing tribunal in the light of all the testimony and the circumstances produced at the trial.

The Home Rule act (*Comp. Stat. of N. J.* 1911-1924), concedes to the defendant protection against removal for political reasons, or "for any other cause than incapacity, misconduct or disobedience of just rules and regulations, established or which may be established for the police force in such municipality." *Crane* v. *The Mayor and Aldermen of Jersey City,* 90 *N. J. L.* 109; *affirmed,* 92 *Id.* 248; also, *Reimer* v. *Freeholders of Essex,* 96 *Id.* 371; *Mannion* v. *Schwarzkopf,* 100, *Id.* 22. In the latter case Mr. Justice Trenchard, speaking for this court, stated: "The mere fact that the superintendent, following a preliminary and informal investigation of the altercation, and before the formal charge of insubordination was made against the corporal, requested the latter's resignation; did not disqualify the superintendent to sit as judge at the formal hearing of the charge, he being otherwise qualified to sit, as required by the State Police act."

These decisions emphasize the fact, as stated in Crane *v.* Jersey City, that no such bias or prejudice as is here alleged can be said to have existed so as to bar or disqualify the trial tribunal from hearing charges against an employe where that tribunal is the only one authorized by statute to hear the charges. In *Ayers* v. *Newark,* 49 *N. J. L.* 170, it was observed that "a policeman under charge is not regarded by the statute as a criminal, but a public agent or servant whose efficiency and fitness for the discharge of his duties may be questioned at any time in the interest of the public, and no mere forms tending to chicanery and delay, rather than substantial justice, should be regarded. The purpose of the law is to secure the service of reliable men to preserve the public peace, not to keep inefficient and litigious men in office until all the forms of criminal cases are observed and every ingenious objection answered." And, the effect of the finding of such a tribunal under the circumstances, where the testimony is sufficient to warrant the finding and to justify the result before an appellate tribunal, is, as was stated in the Crane case (*ubi supra*), where the admission of debatable testimony was con

sidered, as follows: "The admission of illegal testimony in cases tried by a special tribunal, like the one whose proceedings we are now considering, will not have the effect to invalidate the finding of the tribunal, so long as it appears that there is competent evidence in the case to support such finding."

The rule of this court has been consistently stated since the decision of *Reilly* v. *Jersey City,* 64 *N. J. L.* 508, as follows: "In reviewing the action of a board of police commissioners this court will not weigh the evidence taken before them for the purpose of reaching an independent conclusion on the question of the guilt or innocence of the prosecutor."

While the testimony in this case is very voluminous, we have given it full and due consideration, keeping in mind that, as the reviewing tribunal, the question before us really is not whether the director was biased, but whether upon the whole case there was testimony sufficient to justify his conclusion in removing the prosecutor. It is not within our province, under the decisions already referred to and others that might be cited, to review the entire evidence with a view of ascertaining whether or not we might reach a different conclusion from that reached by the director, but, as was observed in another case, the rule is well settled as follows: "If the court were not circumscribed and limited in its duty in this instance by the well-settled rule of law applicable to cases of this character, it might properly be urged to weigh the testimony and, if possible, reach a conclusion different from that which has been reached by the trial tribunal. But the settled rule of law is that if there be evidence upon which the trial tribunal may reasonably be found its conclusion of guilt or innocence, this court will not reverse the judgment by weighing the testimony for the purpose of forming an independent judgment. If the judgment of the trial court can be fairly supported by the record, the duty of this court is at an end so far as further investigation is concerned." *Martin* v. *Smith,* 125 *Atl. Rep.* 142; citing *Reilly* v. *Jersey City,* and *Crane* v. *Jersey City, ubi supra.*

It is doubtful if we can conclude the opinion in the case at bar with a statement more applicable than that contained in

the case of Martin *v.* Smith, as follows: "The police department of our cities, however, is built upon a plane of public efficiency which has ordinary truth and morality as its base; and when these essential elements of public probity be lost, the department shall have lost not only the confidence of the community but the fundamental mainstay and support which is necessary to its effective and satisfactory operation."

Invoking this reiteration as to the finality of the rule of law we conclude that there is testimony in the case of bar sufficient to warrant the judgment of the director, and for that reason his judgment should be affirmed.